# Exhibit 1



COPY

SEP 1 6 2009

MICHAEL K. JEANES, CLERK
E. PEREZ
DEPUTY CLERK

1    Michael C. Manning (#016255)
     Leslie E. O'Hara (#005923)
2    John T. White (#022091)
     **STINSON MORRISON HECKER** LLP
3    1850 North Central Avenue, Suite 2100
     Phoenix, Arizona 85004-4584
4    Tel: (602) 279-1600
     Fax: (602) 240-6925
5    Email: mmanning@stinson.com
     Attorneys for Plaintiffs

6

7          **SUPERIOR COURT OF ARIZONA**

8              **MARICOPA COUNTY**

9    ANTHONY ARAMBULA and LESLEY    )    No.    CV2009-029358
     ARAMBULA, husband and wife;            )
10   MATTHEW ARAMBULA and             )    **COMPLAINT**
     ZACHARY ARAMBULA, through their    )
11   mother and next friend, LESLEY        )
     ARAMBULA,                   )
12                        )    (Jury Trial Demanded)
             Plaintiffs,        )
13                        )
     v.                           )
14                        )
     CITY OF PHOENIX, a public entity;    )
15   CITY OF PHOENIX POLICE           )
     DEPARTMENT; DZENAN            )
16   AHMETOVIC AND JANE DOE        )
     AHMETOVIC, husband and wife;      )
17   SEAN COUTTS AND JANE DOE       )
     COUTTS, husband and wife; BRIAN    )
18   LILLY AND JANE DOE LILLY,       )
     husband and wife; JOHN DOE        )
19   OFFICERS I-X; JANE DOE OFFICERS   )
     I-X; JOHN DOE SUPERVISORS I-X;   )
20   JANE DOE SUPERVISORS I-X; JOHN   )
     DOES I-X; JANE DOES I-X; BLACK    )
21   CORPORATIONS I-X; and WHITE      )
     PARTNERSHIPS I-X,            )
22                        )
             Defendants.       )
23                        )

24

DB04/836101.0002/1438678.2 DD02

# COMPLAINT

Plaintiffs Anthony, Lesley, Matthew, and Zachary Arambula, for their Complaint against Defendants, hereby allege as follows:

## JURISDICTION AND VENUE

1.      Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution; and pendent state common law and statutory law.   Plaintiffs are Anthony Arambula, Lesley Arambula, and their two minor children, Matthew and Zachary, through their mother and next friend, Lesley Arambula.

2.      Plaintiffs have satisfied the provisions of A.R.S. § 12-821.01 by serving upon Defendants a Notice of Claim more than sixty (60) days prior to the date of the filing of this Complaint.  Defendants have not responded to the Notice of Claim.

3.      This Court has jurisdiction of Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1988.  Additionally, this Court has jurisdiction over Plaintiffs' state and federal claims pursuant to Article 6, Section 14 of the Arizona Constitution.

4.      Venue is proper in this Court pursuant to A.R.S. § 12-401, as the majority of parties are residents of Maricopa County, Arizona, and the events underlying this lawsuit occurred in Maricopa County.

## GENERAL ALLEGATIONS

5.      Plaintiffs reallege and incorporate, by this reference, their claims, facts, and allegations in the paragraphs above, as if set forth fully herein.

6.      For all material times, Plaintiffs Anthony ("Tony") and Lesley Arambula ("Lesley") are individuals residing in Maricopa County, Arizona, who reside with their minor children, Plaintiffs Matthew and Zachary (collectively, the "Arambulas," "Plaintiffs," or the "family").

7.      Defendant City of Phoenix (the "City") is a public, municipal entity, formed and designated as such pursuant to Title 9 of the Arizona Revised Statutes and, as such, is subject to civil suit and may be held independently liable as an entity and/or municipality, and/or vicariously liable for the wrongful conduct of its officers, employees, agents, districts, and divisions/sub-divisions, including (without limitation) the City of Phoenix Police Department ("Police"), and the officers and employees of their divisions.

8.      Upon information and belief, Defendant City of Phoenix Police Department ("Police") is a subdivision of the City, pursuant to Chapter III, § 3 of the Charter of the City of Phoenix, and an independent, jural entity subject to civil suit.

9.      At all times material herein, Defendants Officer Lilly, Officer Ahmetovic, and Sgt. Coutts (collectively referred to as "Officers"), were agents and employees of the City and/or the Police who, at the time of the events complained of herein, were acting within the course and scope of their employment by the City and/or Police and under color of law. These individual Defendants engaged in wrongful conduct that allowed, caused, and/or contributed to cause harm to Plaintiffs that caused Plaintiffs damages.  Their actions and/or inactions constitute actions of the City and/or the Police.  The City and/or the Police are vicariously and directly liable for their wrongful conduct, as alleged herein.

10.     At all times material herein, Defendants Police John Does I-X and/or Police Jane Does I-X (collectively "Police John Does") were officers, agents, and employees of the City and/or the Police, acting within the course and scope of their employment and under color of law.  These individual Defendants engaged in wrongful conduct that allowed, caused, and/or contributed to cause harm to Plaintiffs that caused Plaintiffs damages.  Their actions constitute actions of the City and/or the Police.  The City and/or the Police are vicariously and directly liable for their wrongful conduct, as alleged herein.  (The specifically named Police employees and the Police John Does are collectively referred to as "Officers.")

3

11.   The City and all of its subdivisions and their agents and employees specifically named herein or named as Does are collectively referred to herein as the "City" or "Defendants."

12.   The Defendants designated herein as Jane or John Doe spouses, including (without limitation) Jane Doe Ahmetovic, Jane Doe Coutts, and Jane Doe Lilly, are the spouses of the respective individually named Defendants and are so designated because the wrongful conduct of the Defendants was engaged in for the benefit of their marital communities, thereby rendering the spouses and marital communities of such Defendants liable for such conduct.

13.   The true names, capacities, and relationships, whether individual, corporate, partnership, or otherwise of all John and Jane Doe Defendants, Black Corporations, and White Partnerships, are unknown at the time of the filing of this Complaint, and are being designated pursuant to Ariz. R. Civ. P. § 10(f) and applicable federal and state law.   Plaintiffs further allege that all of the fictitiously named Defendants were jointly responsible for the actions, events, and circumstances underlying this lawsuit, and that they proximately caused the damages stated in this Complaint.   Plaintiffs will amend the Complaint to name the unidentified individuals once they have learned, through discovery, the identities and acts, omissions, roles, and/or responsibilities of such Defendants sufficient for Plaintiffs to discover the claims against them.

## FACTUAL BASIS OF CLAIMS FOR RELIEF

### Introduction

14.   Wednesday evening, September 17, 2008, started out as a typical family night in the Arambulas' small rented home.   Lesley had just entered the home from the back patio. Tony was sitting on the couch watching cartoons in their living room with their two year old son, Zachary.   Tony was thinking about going out to purchase a pie as a surprise dessert for his family.   Their oldest son, Matthew, was playing a game in his room.

4

15. Suddenly, the crack of two gunshots turned tranquility into terror and transformed this family forever more. A moment later, an intruder crashed through the Arambula's front window and plunged into the family's living room where Tony and Zachary were sitting.

16. The intruder appeared "crazed" and wielded a 9 millimeter gun at Tony and Zachary. Blessedly, the intruder did not fire on Tony or Zachary. Tony's relief was brief, however. The intruder dashed down the hallway that led to Matthew's bedroom. Tony grabbed Zachary and crawled for safety. After securing a safe spot for Zachary, Tony armed himself with a pistol kept in his closet. Lesley, who had been standing at the rear door, came into the home to check on her family. As she approached the back hallway, Lesley saw the intruder as he made his way through the living room and toward their boys' bedroom. Lesley was frantic with fright and told Tony that the intruder was now inside Matthew's bedroom, with Matthew still in his room!

17. Thanking God that the intruder had not fired on his youngest son, Tony's fright was renewed—this impaired menace was now with Matthew—in Matthew's small bedroom—still armed with that 9 millimeter pistol. Tony knew he now had to act quickly, again, to now rescue his second son from harm's way. Tony told Lesley to take Zachary, and get out of the home, which she did. Tony then bravely approached the intruder in the boys' bedroom in search of Matthew.

18. Tony carefully, but quickly, closed in on Matthew's room. The intruder was on the floor of Matthew's bedroom. Tony pointed his gun downward at the intruder and ordered him not to move. He held the intruder calmly at gunpoint and the intruder was compliant, although the intruder continued to shout that someone was after him and going to get him. Tony believed that the intruder was either crazy or high on drugs.

5

19.     Tony could not see Matthew, but called out for him.  Matthew, who hid in his closet after hearing the initial gunshots, ran to his father's voice and his protection.  Tony ordered Matthew to go quickly to the safety of the back patio with his mother and Zachary and to call 911 immediately.  Then, Tony picked up the nearest telephone and called 911 for police protection, while still holding the intruder calmly at gunpoint.  Tony reported to the 911 operator that he was the homeowner and that he was holding the intruder at gunpoint.

20.     Meanwhile, with both kids now clinging her side on the back patio, Lesley also called 911 to report the intruder in her home.  As it turns out, the Officers were already in the neighborhood, looking for a "Hispanic male" who had reportedly threatened a woman in a different house nearby.

21.     Tony believed that his family's sudden and lethal peril had passed.  He had acted swiftly, bravely, and with a cool head and a calm hand.  His family was safe.  He had disarmed and detained the intruder without unnecessary injury to anyone.  Now, he thought, the terror of the lethal threat had passed; he could relax and wait for the Police to arrive to relieve him.  He assumed that he would soon have his children in his arms and his wife by his side.  No one, not even the menacing intruder, would be hurt.

22.     Tony had done everything just right, exactly the way the Phoenix PD would simulate as the perfect homeowner response to a life-threatening menace and an impaired, armed intruder.

23.     While on the phone with 911, Lesley noticed the Officers come into the alley behind her home.  She yelled to them for help, telling them that there was an intruder inside the Arambula home.

24.     Officers had heard the "crash" (which turned out to be the Arambula window) and rushed into the alleyway behind the Arambula residence, still looking for their suspect.  They did not know if the intruder was armed.

6

25.     Three Officers entered the Arambula's backyard: Sgt. Coutts, Officer Lilly, and Officer Ahmetovic. Officers Ahmetovic and Lilly looked for a way into the home, while Sgt. Coutts walked directly to Lesley to speak with her. Lesley informed Sgt. Coutts that her husband was the one inside, that her husband had a gun, and that he was holding the intruder at gun point. She also told Sgt. Coutts that Tony and the intruder were the only ones inside her home.

26.     But Sgt. Coutts never spoke with the other two officers or ensured that they understood the circumstances they were facing. He never conveyed the information Lesley provided to him—that it was her husband holding the intruder at gun point!

### Officers Open Fire on Tony Without Caution or Warning

27.     Sgt. Coutts finished speaking with Lesley and met the other two Officers at the back entrance. The Officers rushed into the home through the patio door, leaving Lesley and the boys alone and unprotected on the patio, just a few feet away from the patio door.

28.     Sgt. Coutts knew before he and his Officers entered the Arambula home that Tony was holding the intruder at gun point and that Tony and the intruder were the only two people left in the home.

29.     Tony was still angled in the doorway of Matthew's bedroom at the time, holding the intruder on the floor at gun point and holding the telephone to his ear. The 911 call continued to record. Although the Officers were only feet away from Tony when they entered the home, the 911 call does not record any commands, cautions, warnings, or announcements by the Officers.

30.     Tony had his back angled to the living room and to the Officers as they approached him. He could not see the Officers from his vantage point. Tony held the gun in his right hand and steadied himself near a half wall on his right side. He had his 911 call to his

7

left ear. With his back to the Officers, the wall on his right side, and the gun in his right hand, the Officer could not possibly have seen Tony's gun when they arrived at the scene.

31. Tony had done the Officers' work for them. He held the incoherent and irrational intruder at gunpoint without any harm to anyone. All that was left for the Police to do was assume Tony's control of the situation, cuff the intruder, and remove him from the Arambula home.

32. But, unbeknownst to Tony, the nightmare which he had put to the past with perfect control, was about to turn into his family's new nightmare. The Police did not assume the professional control that Tony had secured for them. Instead, when the Officers entered the Arambula home, Officer Lilly immediately opened fire on Tony's back without any warning! The first shot's exit wound left a gaping hole in the front of Tony's abdomen, on his left side, large enough to fit an eight ounce Dixie cup. Then, Officer Lilly shot Tony five more times, twice after Tony was already on the ground!

33. Tony cried out, "You just killed...you just killed the homeowner. The bad guy is in there." The Officers then ran to the room where the intruder had remained restrained and compliant to Tony's command. While they were quick to open fire on Tony without warning or caution, the Officers gave the intruder verbal commands to come out of the room, and he complied. The intruder was handcuffed and taken out of the home by the Officers, while Tony still laid on the ground in his living room, bleeding from multiple gunshot wounds from his trigger-happy protector's pistol.

### Officers' Continuing Reckless Conduct

34. Officer Lilly is a Field Training Officer ("FTO") for the City. He was training Officer Ahmetovic at the time he opened fire on Tony. FTOs are charged with the responsibility of teaching other Officers how to remain cool, professional, and to follow proper

8

protocol, including responses to the usual and recurring situations that the Police face in the field.

35.     But Officer Lilly also admitted that it was only *after* Tony was laying, bullet-ridden, on the ground that he assessed the situation.  The 911 tape continued to record what happened even after Officer Lilly unloaded his weapon into Tony, including Officer Lilly's post-shooting, one word "assessment": "Fuck."[1]

36.     After Officer Lilly's "assessment," Tony was bleeding badly and struggling for a breath on the floor of his own home, but Officers told this helpless victim to "shut the fuck up." Tony then asked, "Officer, why did you kill me?"  Tony received no answer.

37.     Tony believed he was going to die; the 911 tape records his plaintive goodbye to his family: "..., I love you...I love you."  Then, Tony made what he believed was a dying request to the Officers, he did not want his young family see him shot and bloodied.

38.     Officers callously ignored his request and painfully dragged Tony, by his injured leg, through the home and out to his backyard patio, where they left him bloodied and shot right in front of Lesley, Matthew, and Zachary.

39.     Lesley and the boys did not know who was shooting or who had been shot inside their home.  They heard the gunshots from only a few feet away.  Of course, the shots scared Lesley, Matthew, and Zachary.  They were fearful not only for Tony, but also for themselves, not knowing whether the armed, crazed, intruder would exit the home at any moment and fire at them too.

40.     As soon as the shots stopped, Lesley called 911 again to request an ambulance, saying "someone just got shot."  She had no idea at the time that the "someone" was Tony.

---

[1] A transcript of the 911 call from Tony is attached as Exhibit A hereto and incorporated by this reference.

9

The 911 call continues to record as, moments later, the Officers dragged Tony out of the home and laid him right in front of her and the two boys, bullet-ridden and bloodied.

41.    After that, the City treated the Arambulas callously; they treated the Arambulas like suspects in a drug bust. Lesley and the boys were immediately rushed away and separated from Tony, confined to a Police squad car for hours, while several officers interrogated Lesley. Lesley was moved with such physical force by Officers that she sustained bruises.

42.    Tony remembers lying on the concrete patio, all alone, thinking he would soon die. He pled for someone to help him. Up to that point, he had received no medical attention from the Police, even though the Police knew that they had shot the wrong man; the intruder had already been apprehended by Officers and was taken into custody, and more Officers had arrived on the scene. Still, Tony received no immediate help.

43.    Instead, Tony lay on the patio, bleeding, and continuing to plead for help, as Officer after Officer stepped over him on their way to attend to other apparently important matters. After some time and still without any medical treatment or medical supervision, a few Officers picked Tony up by his limbs—including those limbs shot-up by Officer Lilly—and painfully carried him around the house. In the process, the Police hit Tony's head on a post as they tried to squeeze him through the side gate. They then put him down in the gravel.

44.    Tony, who had been shot six times by Police, had still not received any medical attention even well after being shot. At that point, the Police decided to pick him up, again, and place him on top of the hood of a Police squad car that had been running. The hood of the car was so hot against Tony's bullet-ridden body that Tony screamed with pain. The Police then drove the squad car down the street with Tony lying on top, writhing in pain!

45.    Tony was eventually taken to the hospital by ambulance, where he was immediately rushed to surgery.

10

### Officer Lilly's Admission and the Beginning of a Police Cover-up

46.     The Officers did not realize that they were being recorded by the 911 call that Tony had placed before the shooting.  The 911 call continued to record even after Tony had been shot.  In that recording, Officer Lilly admits to Sgt. Coutts, "we fucked up."  Sgt. Coutts knew that Officers had just shot-up and likely killed an innocent homeowner and the husband of Lesley, with whom he had spoken before entering the home, instead of the armed intruder.

47.     Sgt. Coutts was quick to commence the cover-up of their terrible mistake.

48.     Sgt. Coutts asked Officer Lilly where Tony's gun was at the time Officer Lilly had opened fire on Tony.  Officer Lilly admitted he did not know where Tony's gun was: "I don't know.  I heard screaming and I fired."

49.     Officer Lilly later admitted that he immediately fired at Tony's center mass area and kept shooting even while Tony laid still on the ground.  He said he opened fire because he heard loud noises and saw someone who looked like he might be the "Hispanic" male they were pursuing and simply opened fire and unloaded his weapon in a shoot-to-kill attack on Tony's back, before ever assessing the situation and without ever giving any verbal commands.  Obviously, none of the other Officers perceived the same threat; they did not shoot at Tony.

50.     Still not knowing that he is being recorded on the 911 tape, Sgt. Coutts interrupted  Officer Lilly's admission and apology with his assurance that the cover-up would commence: "That's all right.  Don't worry about it.  I got your back.....We clear?"

51.     Just a few hours after Sgt. Coutts' chilling announcement of the commencement of the cover-up, it began in dishonorable earnest.  Officer Lilly admitted on the 911 tape that he did not know where Tony's gun was and that he just heard screaming and started shooting, but now, later, Officer Lilly created a new version:  he told the Police Internal Affairs investigator hours later that he fired after Tony pointed the gun in his direction in the "ready" position.

11

52.   In a subsequent Police interview, Officer Lilly claims that he fired because he was fearful for himself—not for anyone else—after he saw a man who might be "Hispanic" down the hallway with a gun, even though Officer Lilly admitted that the gun was not pointed at him, but angled toward the floor.

### Defendants' Continued Callous Treatment of the Arambulas

53.   Lesley and the boys, who had been whisked away from Tony while he was laid before them, shot and bloodied, on their patio, were being treated like suspects, held captive in a Police squad car. All Lesley wanted was an update on her husband's condition and a glass of water. She was denied both. Officers refused to allow her or her boys to go to the hospital for nearly four hours and even hurled suspicions at her, asking her, "What do you have to hide?" Several different officers interrogated her for hours.

54.   Meanwhile, the Police ordered the hospital staff to not reveal to the public or any of the Arambulas' friends or family that Tony was ever there. They also treated Tony like a suspect, instead of the innocent victim and hero he was. Friends and family members tried to see Tony and get access to him. Because of those Police orders, they were denied access and even told by the hospital staff that they could not even confirm that Tony was at the hospital.

55.   Lesley and the boys were also denied access to or information about Tony for hours. Obviously, the Police wanted to question Tony before they let him see his loved ones. And that is exactly what they did.

56.   After undergoing hours of surgery following the shooting, Tony awaken to immediately interrogation by Police detectives. Police asked him detailed questions about his positioning and about the Officers and recorded his statement. Tony, still recovering groggy and disoriented from surgery, tried his best to answer the questions. After the interview ended, Police told Tony that, unfortunately, the intruder would only be cited and released because, Police said, the intruder was unarmed. Tony was incredulous at their conclusion and asked the

12

Police if they had looked under Matthew's bed.  The Police assured him that they had done so and completed a thorough investigation, but promised to go back and look again.  When the Officers returned to the Arambula home, after their crime scene "professionals" had previously "cleared" the crime scene, they found the intruder's 9 millimeter gun, in plain sight, under Matthew's bed!

### The Growing and Uncertain Injury and Harm to the Arambulas

57.     The events of September 17 have devastated the Arambula family.  They have incurred significant damages as the result of the incident, which are ongoing and will increase in the future.

58.     Tony's billed medical costs stemming from the incident with Phoenix Police have already exceeded $250,000 and are expected to greatly increase in the future with the additional care doctors have told him he will need.

59.     Doctors initially told Tony that there was a high probability that his hand and wrist would have to be amputated because of the injuries he sustained.  Thus far, they have avoided amputation.  But his future prognosis with respect to his wrist is unknown.

60.     Doctors have told Tony that his wounds introduced them to medically uncharted waters—they have never before attempted to repair a wrist, with so much trauma and bone loss.  At a January 14, 2009 appointment, when pressed by Tony, one physician estimated that there was a 60-70% chance that the latest bone graft procedure (performed in December 2008) would hold, but that it would take approximately five years to know whether his bone would fully redevelop.  Assuming the graft holds, Tony has been told that he will likely need three to five additional surgeries in the future to repair the remaining damage to his wrist, in addition to the follow-up care, medication, and physical therapy.

61.     Doctors have told Tony that the years of additional surgeries, pain, and disability described above is the best possible outcome.  But, they have also warned him that he will

13

suffer some permanent loss of use of his hand and wrist. Doctors estimate that there is a 30-40% chance that the recent graft procedure will not be successful. If it is not, then he will suffer far more dramatic damage and greater disability. Before amputation, doctors would first attempt to implant a "mechanical structure" into his wrist, hoping that it would allow them to perform additional surgeries to save his hand and wrist.

62.     In addition to the concerns with respect to his wrist, Tony has suffered permanent and life-long injuries. Even if Tony gains back full use of his wrist, doctors have told him to expect a lifetime of pain and arthritis as a result of his wounds. The bullets that penetrated Tony's knee and leg have left him with daily pain and swelling.

63.     Doctors have told him that they are unsure about whether he will suffer any long-term arterial damage and that he should, at least, expect to deal with increased pain and arthritis throughout his left leg for the rest of his life. In addition, the surgeries performed to date on his wrist required doctors to intentionally break Tony's right hip and remove fragments of bone to place in his wrist.

64.     As a result, Tony must now live with daily pain in his hip and doctors have also warned him that he will endure lifetime of arthritis and discomfort. At the age of 35, Tony now faces chronic arthritis and pain throughout his body that, for the rest of his life, will greatly diminish the ability for him to live his life, engage in an active lifestyle, and do what fathers love to do with his young sons. In addition, he has endured great pain and suffering and emotional distress on the night of September 17 and afterward.

65.     Tony's wife and young sons have suffered a tremendous amount of trauma from their experience, as well. The family is under increased financial pressure, as Tony and Lesley have been forced to take significant time off of work and have had to pay for increased medical costs. Following the incident, Lesley was not able to work full time, was placed on temporary medical leave, and has recently been laid-off. The family has also had to pay thousands of

14

dollars for the costs of repairing their home, cleaning the bloody carpets and walls, and fixing shattered glass and bullet holes.

66.     The family has also suffered significant emotional trauma, and Lesley and the boys have all suffered a loss of consortium with Tony as the result of what happened.

67.     The boys have seen a therapist and Lesley has also started therapy to deal with the anxiety she has experienced since the incident.   Her doctors initially placed her on temporary leave and told her she needs some time away from work to heal.

68.     Lesley, Matthew, and Zachary have all suffered physical effects of the emotional trauma they experienced.   Lesley even suffered bruises from the way in which the police grabbed and controlled her that evening.   All were in the zone of danger that September 17 evening, subjected to the outrageous conduct of the Police and fearful for their own safety and for Tony's.

69.     There is simply no excuse or defense for what was done to this family and no tolerable justification for the way Police acted toward the Arambulas that night or afterward, in attempting to cover-up their reckless and callously indifferent actions.

## Defendants' Outrageous Efforts to Blame the Arambulas for What Happened

70.     From the moment Officer Lilly shouted his admission: "we fucked up," Defendants engaged in a series of intentional acts and omissions designed not only to cover-up their mistakes, but to ceaselessly and artificially shift blame to the Arambulas for what they so carelessly did to Tony and his family.

71.     For example, Defendants have contacted friends and neighbors of the Arambulas with the design of tainting their memories and deflecting responsibility from their admitted failures. Defendants told at least one neighbor, for example, that they had specifically warned Tony to drop his weapon before they fired and that they had been shouting "Police" all the way through the Arambulas' home and until the moment Officer Lilly fired, knowing that was not

15

true. Tony and Lesley certainly never heard such shouts, and the 911 tapes never recorded any such warnings. Tellingly, even Officer Lilly admitted immediately after shooting that he had simply heard noises and opened fire without caution or warning.

72.    In addition, Defendants have engaged in a lowly attempt to sully the reputation of their victims. For example, Defendants interviewed the firearms dealer who sold Tony one of his handguns (knowing it was not even the gun used by Tony that evening) and suggested that Tony may have illegally obtained weapons. The dealer, offended at such implications, told them unequivocally that Tony had purchased his weapons legally and that he would not help them promote their implications.

73.    In addition, Defendants recently invited Tony to come to the Police station to pick up his handguns, holsters, keys, and other items seized by the Police as evidence. When Tony arrived at the station, he was asked to "wait in the lobby." While he waited, two Police detectives asked him to come into their office, where they shut the door and began to question him, suggesting that they had "discovered" two outstanding felony drug  warrants in his name. When Tony insisted that the detectives had mistaken him for someone else, they said, "You are Tony Arambula, right?" The detectives asked for his date of birth and social security number and suggested that they had already matched the information to two outstanding arrest warrants in the states of Washington and Oregon. Tony told them that he had never even been to either of those states, that he was in Arizona in January and February 2009 recovering from surgery that resulted from being shot by Officer Lilly. The detectives then returned a few minutes later saying they had "discovered" that not all of his information matched the warrants and that he was free to go. But, they warned him to "be careful," suggesting that he might just be arrested and taken to jail if he encountered any Police, because of the "confusion" regarding the warrants.

16

74.    This and other extreme and outrageous conduct by Defendants since the shooting occurred has caused even more harm and emotional distress to the Arambulas and is further evidence of the extent to which Defendants are apparently willing to go to cover-up their supremely careless and tragic mistakes.

75.    Of course, Defendants know that the Arambulas deserved none of this. Defendants have made things worse for this family by attempting to manufacture negative facts about the Arambulas or manufacture evidence which might divert blame for Defendants' misconduct.

76.    Phoenix PD is a good police department with a good reputation.  But, like all police departments, mistakes are made in the field; and this was an awful and unnecessary mistake.  But, rather than adhere to their core values or their department's motto to "protect and serve," Defendants decided to attack their victims a second time in a dishonorable effort to avoid their obvious responsibility and their tragic mistakes.

77.    Wednesday night, September 17, 2008, Tony Arambula had an obvious and honorable responsibility—to protect his wife and kids from an armed and crazed home invader. He discharged his responsibility bravely, but with a cool head and a calm hand.

78.    Wednesday night, September 17, 2008, Defendants' inexcusable ineptitude and violations of their own procedures damaged Tony and his family forever.

79.    Later, on Wednesday night, September 17, 2008, Defendants compounded those injuries with the dishonorable insult of their clumsy attempt to cover-up their tragic mistakes.

### FIRST CLAIM FOR RELIEF
#### (Negligence—All Defendants)

80.    Plaintiffs re-allege and incorporate, by this reference, the claims, facts, and allegations set forth in the paragraphs above, as if set forth fully herein.

17

DB04/836101.0002/1438678.2 DD02

81.    Defendants have a statutory and common law duty to assure the safety and well-being of persons in their care and custody—a duty that includes (without limitation) using only necessary and reasonable force.  Defendants also have a duty to provide proper care to the citizens under their care, custody, and control, and a duty not to interfere with the relationship between children and their husband and a wife and her husband.

82.    The Officers breached their duties to Plaintiffs, as identified by the claims, facts, and allegations set forth in the paragraphs above, by (among others and without limitation): subjecting Tony to excessive and lethal force by shooting Tony in a manner that was excessive, unreasonable, and unjustified under the circumstances; by failing to intervene to prevent excessive force and indifference to Tony's medical needs; by failing to disclose, convey, and share critical information about Tony before entering the home; by failing to appropriately care for and treat Tony after shooting him, by ignoring his medical needs; by subjecting him to emotional trauma by placing him in front of his wife and children; by failing to monitor or assess his medical condition or get him treatment before moving him around his house and then onto the hood of a hot squad car; by detaining and preventing Lesley and boys from leaving the area of the home and unfairly interrogating and accusing her; by failing to properly follow the applicable protocols, practices, policies, training, and standards of law enforcement; by failing to properly supervise and train other officers and agents; and by improperly investigating the Arambulas and covering-up their obvious mistakes.

83.    The City and the Police are legally responsible for the screening, hiring, training, retaining, and supervision of all employees and agents who have responsibility for the processing, handling, and managing those in the care, custody, and control of the Police, including those citizens encountered by the Police during their investigation and pursuit of suspects and criminals.  This responsibility includes (among other things and without limitation) making certain that such employees and agents satisfy all federal, state, and

18

applicable standards. It also includes (among others and without limitation) making certain that Police policies, procedures, practices, protocols, customs, and training satisfy all federal, state, and applicable standards. And it also includes (among others and without limitation) responding to known problems and/or improper customs, policies, practices, procedures, training, and/or conditions. The City and Police were negligent in the performance of those duties and responsibilities. The responsibility for overseeing the operations of the Police lies with the City and its policymakers and/or supervisors. The City and Police breached the duties to Plaintiffs, as identified by the claims, facts, and allegations set forth in the paragraphs above, by (among others and without limitation): ratifying improper conditions, customs, policies, procedures, and/or practices by inaction; implementing, utilizing, and/or permitting to exist unreasonably dangerous policies, practices, protocols, customs, and training (or lack thereof) with respect to (among others and without limitation) the use of force; approaching, arresting, and/or responding to citizens; investigating and pursuing criminals and suspects; reporting, communicating, conveying, and disseminating critical information in emergency situations; proper protocols for issuing verbal commands and dealing with homeowners who have detained intruders in their homes; proper monitoring, assessing, and treating of the medical condition and needs of those in the care, custody, and control of the Police; and/or allowing family members to accompany their loved-ones to the hospital and privately grieve their loss.

84.    John Doe Supervisors and Jane Doe Supervisors, whose true identities and responsibilities are not yet known or knowable by Plaintiffs but will be discovered through litigation, have individual, supervisory responsibility for overseeing the operations of the Police and the actions of the Officers underneath them, as well as ensuring that the Police are provided with the proper training, education, resources, and knowledge necessary to comply with applicable federal and state laws and standards. They are also responsible for ensuring that every Police officer is properly qualified to perform the duties of the job, and that the

19

policies, procedures, customs, practices, and/or protocols of the Police are proper, legal, and complied with. They are also responsible for taking appropriate measures to correct any problems they aware or put on notice of with respect to the Police. Each of these supervisors was negligent in the performance of such duties, as alleged herein this Complaint.

85.    All of the individual Defendants were acting under color of law at all times material hereto and within the normal course and scope of their employment.

86.    Defendants, directly and through their employees and agents, were negligent in the handling, treatment, and care of Tony, Lesley, Matthew, and Zachary, as identified by the claims, facts, and allegations set forth in the paragraphs above.

87.    Defendants breached their duties owed to Plaintiffs, as identified by the claims, facts, and allegations set forth in the paragraphs above.

88.    Defendants' breaches of their duties constitute negligence that was the proximate cause of Plaintiffs' damages, having caused and/or contributed to cause their injuries and suffering.

89.    As the direct and proximate result of Defendants' negligence, Plaintiffs and have suffered and will continue to suffer in the future a loss of love, affection, companionship, care, protection, guidance, as well as pain, grief, sorrow, anguish, stress, shock, and mental suffering, and economic and non-economic damages in an amount to be proven at trial.

90.    The wrongful conduct and/or gross negligence of Defendants was malicious and in reckless disregard of the rights of Plaintiffs and, as a result, punitive damages in an amount to be determined by a jury should be awarded against each of Defendants to punish them for their wrongdoing and to deter and prevent them and others from acting in a similar manner in the future.

DB04/836101.0002/1438678.2 DD02

## SECOND CLAIM FOR RELIEF
### (Gross Negligence—All Defendants)

91.   Plaintiffs re-allege and incorporate by reference the claims, facts, and allegations set forth in the paragraphs above, as if set forth fully herein.

92.   Defendants acted and/or failed to act, despite knowing or having reason to know that Tony was in need of medical treatment and was inappropriately subjected to the force that was applied to him and that he was at risk of serious harm and injury.

93.   Defendants failed to provide proper medical care to Tony and subjected him to reckless and excessive force, and/or failed to intervene to prevent excessive force, as alleged above, despite knowing that he was at risk of serious harm and injury.

94.   Defendants also failed to safeguard and protect Lesley, Matthew, and Zachary, knowing they were at risk for serious harm and injury, as alleged above.

95.   All of the individual Defendants were acting under color of law at all times material hereto and within the normal course and scope of their employment.

96.   Defendants, directly and through their employees and agents, were negligent in the handling, treatment, and care of Tony, Lesley, Matthew, and Zachary, as identified by the claims, facts, and allegations set forth in the paragraphs above.

97.   Defendants, directly and through their employees and agents, were reckless and/or grossly negligent in the handling, treatment, and care of Plaintiffs.

98.   Defendants were reckless and/or grossly negligent in their failure to provide proper medical care to Tony, as identified by the claims, facts, and allegations set forth in the paragraphs above.

99.   Defendants, directly and through their employees and agents, were reckless and/or grossly negligent in the use of excessive force on Tony, as identified by the claims, facts, and allegations set forth in the paragraphs above.

21

100.   Defendants breached their duties owed to Plaintiffs, as identified by the claims, facts, and allegations set forth in the paragraphs above.

101.   The conduct and/or omissions of Defendants created an unreasonable and reckless risk of bodily harm and/or serious injury to Plaintiffs.

102.   The conduct and/or omissions of Defendants created the high probability that substantial harm or injury would result, which it did.

103.   Defendants' breaches of their duties constitute gross negligence, which was the proximate cause of Plaintiffs' injuries and damages.

104.   As the result of Defendants' gross negligence, Plaintiffs suffered injuries, have suffered and will continue to suffer in the future a loss of love, affection, companionship, care, protection, guidance, as well as pain, grief, sorrow, anguish, stress, shock, and mental suffering, and have suffered both economic and non-economic damages in an amount to be proven at trial.

105.   The wrongful conduct and/or gross negligence of Defendants was malicious and in reckless disregard of the rights of Plaintiffs and, as a result, punitive damages in an amount to be determined by a jury should be awarded against each of Defendants to punish them for their wrongdoing and to deter and prevent them and others from acting in a similar manner in the future.

### THIRD CLAIM FOR RELIEF

### (Violation of 42 U.S.C. § 1983:  Unconstitutional Policies, Customs, and Failure to Train—Defendants City, Police, and John Doe Supervisors and Jane Doe Supervisors)

106.   Plaintiffs re-allege and incorporate by reference their claims, facts, and allegations contained in the paragraph above, as if set forth fully herein.

107.   The City, Police, John Doe Supervisors, and Jane Doe Supervisors (in their official capacities), directly and by and through their agents and official policymakers,

22

establish policy for the Police, oversee operations of the Police and the services provided by them, evaluate, certify, and maintain the Police Department's compliance with applicable standards, and are ultimately responsible for everything that happens in the City's Police Department. Such actions constitute official municipal policy, customs, and practices.

108.   The City, Police, John Doe Supervisors, and Jane Doe Supervisors (in their official capacities) have oversight and supervisory responsibility over their officers, employees, and agents with respect to Police matters. They are entities and/or municipalities, directly liable under 42 U.S.C. § 1983.

109.   Upon information and belief, the City, Police, John Doe Supervisors, and Jane Doe Supervisors (in their official capacities) have long been on notice and had knowledge of the dangerous and unconstitutional conditions that led to Doris' death.

110.   Upon information and belief, despite their knowledge of and notice to them, the City, Police, John Doe Supervisors, and Jane Doe Supervisors (in their official capacities) were deliberately and callously indifferent in training (and/or failing to adequately train) Police personnel, employees, and agents in (among other things) the appropriate, lawful and constitutional policies, procedures, practices, protocols, and customs for the assessment, provision of medical care, use of force, and the processing, evaluation, handling, management, and restraint of citizens, and the other usual and recurring circumstances Police face, as alleged herein.

111.   Upon information and belief, despite their knowledge and notice, the City, Police, John Doe Supervisors, and Jane Doe Supervisors (in their official capacities) were deliberately and callously indifferent to the care and safety of citizens, through fostering, encouraging, and knowingly accepting formal and informal Police policies or customs condoning indifference to medical conditions and care and the use of excessive force and

23

improper restraint of citizens, such that bodily harm and other injury to citizens was likely to occur in a manner similar to that of Plaintiffs, as alleged herein.

112.   Upon information and belief, despite their knowledge and notice, the City, Police, John Doe Supervisors, and Jane Doe Supervisors (in their official capacities) knew and should have known that unconstitutional policies, procedures, practices, protocols, customs, and training (or lack thereof) existed within the Police, and they failed to address these issues, ratified them by inaction, and/or failed to establish and implement appropriate policies, procedures, practices, protocols, customs, and training for providing medical care, using force and restraints, and processing, handling, and managing citizens in the care, custody, and control of the City in a manner that conformed to federal, state, and applicable standards.

113.   Upon information and belief, despite their knowledge and notice, the City, Police, John Doe Supervisors, and Jane Doe Supervisors (in their official capacities) permitted and/or ratified the implementation of inappropriate, unconstitutional, *de facto* policies which authorized, approved, condoned, and failed to provide appropriate medical evaluation and care to citizens, failed to provide appropriate use of force and restraint, and failed to adequately train and supervise Police personnel in these and other areas (without limitation), as alleged herein.

114.   These Defendants' deliberate, reckless, and callous indifference in failing to train in these (and others without limitation) areas and the condoning and/or ratifying of such policies, practices, procedures, protocols, and customs as described herein caused, substantially contributed to, and/or was the moving force behind the violations of Plaintiffs' constitutional and state law rights, as alleged herein.

115.   The wrongful conduct of Defendants, as described herein, constitutes violations of 42 U.S.C. § 1983, in that with deliberate and callous indifference, they deprived Plaintiffs of rights, privileges, and immunities secured to them by the Constitution and laws of the United

24

States, including (among others and without limitation) the right to adequate medical care while in the custody and control of law enforcement, the right to be free from law enforcement's excessive force, and the right to the continued familial and societal relationship, guaranteed by the Fourth, Eighth, and Fourteenth Amendments.

116.   The wrongful conduct of Defendants constitutes violations of the United States Constitution, Amendments IV, XIII, and XIV, in that Plaintiffs were deprived of the privileges and immunities guaranteed to all citizens of the United States; were deprived of their life and liberty without due process of law; were denied equal protection of the law; and were denied their right to be free of unlawful punishment, to be free from excessive force, and to receive adequate medical care.

117.   The wrongful conduct of the other individually-named Defendants, was malicious and in reckless disregard of the rights of Plaintiffs, and punitive damages in an amount to be determined by a jury should be awarded against them to punish them for their wrongdoing and to deter and prevent them and others from acting in a similar manner in the future.

### FOURTH CLAIM FOR RELIEF
#### (Violation of 42 U.S.C. § 1983:  Deliberate Indifference to Medical Needs and Excessive Force—All Defendants)

118.   Plaintiffs re-allege and incorporate by reference all claims, facts, and allegations set forth in the paragraphs above, as if set forth fully herein.

119.   At all times material hereto, Defendants were acting under color of law and within the course and scope of their employment.

120.   Each of the Defendants demonstrated deliberate indifference to Tony's medical needs and either used or caused to be used excessive force upon him or failed to act to prevent the use of excessive force upon him, as alleged herein.

25

121.   Defendants' acts and omissions, as alleged herein, constitute constitutional violations, including (among others and without limitation) deliberate indifference to serious medical needs and/or excessive force.

122.   The wrongful conduct of Defendants as described herein proximately caused, substantially contributed to, and/or was the moving force behind the violations of Plaintiffs' rights and Plaintiffs' injuries and damages.

123.   The wrongful conduct of Defendants as described herein constitutes violations of 42 U.S.C. § 1983, in that with deliberate and callous indifference and/or excessive force, they deprived Plaintiffs of rights, privileges, and immunities secured to them by the Constitution and laws of the United States.

124.   The wrongful conduct of Defendants as described herein violated Plaintiffs' rights under the Fourth Amendment, Eighth Amendment, and Fourteenth Amendment of the United States Constitution, in that they were deprived of the rights, privileges, and immunities guaranteed to all citizens of the United States; were deprived of life and liberty without due process of law; were denied equal protection of the law; were denied proper medical treatment; and were subjected to unlawful and improper punishment.

125.   The actions of Defendants acting in their individual capacities, were malicious or reckless in disregard of the rights of Plaintiffs and punitive damages in an amount to be determined by a jury should be awarded against each of them to punish each of them for their wrongdoing and to deter and prevent them and others from acting similarly in the future.

### FIFTH CLAIM FOR RELIEF

### (False Arrest; Unlawful Detention; False Imprisonment - All Defendants)

126.   Plaintiffs re-allege and incorporate by reference all claims, facts, and allegations set forth in the paragraphs above, as if set forth fully herein.

26

DB04/836101.0002/1438678.2 DD02

127.  Defendants intentionally, unlawfully, and/or without lawful authority, arrested and/or detained Plaintiffs without their consent.

128.  Defendants intentionally, willfully, and/or without lawful authority also prevented Plaintiffs Lesley, Matthew, and Zachary from accompanying Tony to the hospital and from speaking with him or finding out about the status of his injuries.

129.  Defendants' arrest and/or detention of Plaintiffs was unlawful and without consent.

130.  Defendants' unlawful detention, false arrest, and/or false imprisonment deprived Plaintiffs of their liberty and freedom, in contravention of the guarantees of the Fourth Amendment to the United States Constitution and Arizona law.

131.  Defendants' unlawful detention, false arrest, and/or false imprisonment violated Plaintiffs' constitutional and Arizona-law rights, in violation of 42 U.S.C. § 1983 and Arizona law.

132.  As a result of Defendants' unlawful detention, false arrest, and/or false imprisonment, Plaintiffs have suffered harm in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

### (Violations of Arizona Law:  Emotional Distress - All Defendants)

133.  Plaintiffs re-allege and incorporate by reference all claims, facts, and allegations set forth in the paragraphs above, as if set forth fully herein.

134.  Defendants' acts and/or omissions negligently and/or intentionally inflicted emotional distress upon Plaintiffs, including such things as (among others and without limitation) their callous treatment of and/or use of excessive force upon Tony knowing that Lesley, Matthew, and Zachary were present and in close proximity; their callous treatment to prevent Plaintiffs from accompanying Tony to the hospital; their callous treatment of Plaintiffs to drag Tony, shot and bleeding, out of the home and leaving him on the ground right in front

27

of Lesley, Matthew, and Zachary; their failure to protect Lesley, Matthew, and Zachary and concomitant use of force and gun shots knowing that Lesley, Matthew, and Zachary would fear for their safety and Tony's safety; and their use of excessive force upon and callous treatment of Tony.

135.   Defendants were aware that Lesley, Matthew, and Zachary were the wife and sons of Tony and that they were present for all material times.

136.   Defendants' acts and omissions were shocking, extreme and outrageous, and beyond all possible realms of decency.

137.   Defendants' acts and omissions were intentionally aimed at causing Plaintiffs' emotional distress and/or were recklessly in disregard of the near certainty that emotional distress would result from their misconduct.

138.   Defendants' acts and omissions constitute negligent, reckless, and/or intentional infliction of emotional distress.

139.   As a direct and proximate cause of Defendants' intentional, reckless, and/or negligent infliction of emotional distress, Plaintiffs have suffered severe emotional distress and harm in an amount to be proven at trial.

### JURY TRIAL

140.   Plaintiffs hereby request and demand a trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for damages for judgment against Defendants as follows:

a)   General damages in an amount to be proven at trial, as to the causes of action, claims, and theories of relief alleged herein;

b)   Punitive damages in an amount deemed just and reasonable against the individual Defendants as to the causes of action, claims, and theories of relief alleged herein;

28

c)  Costs and attorneys' fees against all Defendants as to the causes of action, claims, and theories of relief alleged herein under the Constitution and laws of the United States, pursuant to 42 U.S.C. § 1988;

d)  Economic and non-economic damages pursuant to applicable Arizona and federal law;

e)  The costs of litigation;

f)  All remedies provided by 42 U.S.C. § 1983; and

g)  Such other and further relief which may seem just and reasonable under the circumstances.

DATED this **16th** day of September, 2009.

STINSON MORRISON HECKER LLP

By: _____
Michael C. Manning
Leslie E. O'Hara
John T. White
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Attorneys for Plaintiffs

ORIGINAL filed this 16th day of
September, 2009:

Clerk of the Court
Maricopa County Superior Court
101/201 West Jefferson
Phoenix, Arizona 85003

_____

29

DB04/836101.0002/1438678.2 DD02

**EXHIBIT A**

Call #5: F1871
Anthony Arambula
3126 E. Flower
Incident No. 081601871
Time Received: 20:04:19

| Time lapsed | Speaker | |
|---|---|---|
| 0:00 | Arambula: | I want to see your hands. |
| 0:02 | 911: | 911, what is the location of the emergency? |
| 0:04 | Arambula: | 3126 East Flower |
| 0:06 | 911: | What's the emergency? |
| 0:07 | Arambula: | I just heard gunshots through my window. |
| 0:09 | Canales: | ……coming too. |
| 0:11 | 911: | Is anybody in your house? |
| 0:12 | Arambula: | I don't know yet,.  But I have two kids here. |
| 0:14 | 911: (simultaneous) | Okay, Sir, I want you to check your children immediately.  Check your children. |
| 0:15 | Arambula: (simultaneous) | I have a man in my house and I have him at gunpoint. |
| 0:17 | 911: | Check your children.  I'll get some help started.  Check your family, Sir. |
| 0:20 | | [screaming, sound of gunshots fired.] |
| 0:24 | Arambula: | I'm sorry, I'm right here, I'm right here.  I'm the homeowner.  You just killed, you killed the homeowner.  The bad guy's in here. |
| 0:33 | Police: | Get out, get out, get out man, get out. |
| 0:36 | 911: | What's going on sir? |
| 0:37 | Arambula: | Oh, my God.  Oh, my God. |
| 0:40 | 911: | Sir, what's happening? |
| 0:41 | Arambula: | I'm the homeowner. |
| 0:42 | Police: | 998 |
| 0:43 | Arambula: | I'm the homeowner. |
| 0:44 | Police: | Right now. |
| 0:45 | 911: | What's happening, Sir? |
| 0:48 | Arambula: | Call 911.  I just died.  Please. |
| 0:52 | 911: | Sir, I've got help coming, tell me what happened. |
| 0:54 | Arambula: | I could die ……….. |
| 0:56 | Police: | Okay. |
| 0:58 | Arambula: | You …..  I can't believe this is happening to me. |
| 1:01 | Police: | _____ it out me now. |
| 1:02 | 911: | Sir, can you tell me what's going on? |
| 1:05 | Arambula: | Oh, my God. |
| 1:07 | 911: | Sir? |
| 1:08 | Arambula: | Oh, my God. |
| 1:09 | Police: | Where's the gun?  Is there a gun inside there, Sir? |
| 1:11 | Police | [inaudible] |
| 1:13 | Police: | Okay. |

1

| Time lapsed | Speaker | |
|---|---|---|
| 1:16 | Police | Fuck |
| 1:17 | 911: | Sir? |
| 1:17 | Police: | 71.  We have him contained in the west bedroom. |
| 1:20 | Police: (multiple voices yelling) | Get out here now.  Get on the ground right now.  Roll your ass out of here right now, Mother Fucker.  Get down.  Get your ass out here. |
| 1:30 | | [Beep, beep beep sound of 911 calling Fire] |
| 1:34 | Police: | Get the fuck out.  Right now Mother Fucker. |
| 1:42 | Fire: | Fire Department.  What's the address? |
| 1:42 | Police: (multiple voices) | [inaudible voices in the background]  …. |
| 1:43 | 911: | Say, I've got someone saying there are shots fired at 3126 East Flower.  I'm not getting any response from my caller.  I just wanted to get you on the line with me and do whatever you need to do, but they're not answering.  I've heard shots over the phone and heard someone yelling.  I think someone's hurt, but I don't know. |
| 1:59 | Fire: | Okay.  I'll let the supervisor know.  Thank you. |
| 2:03 | Police: | What's your address? |
| 2:04 | 911: | Okay.  Okay.  I guess we're on scene.  It's some kind of officer involved shooting.  Do you want to stage?  I don't even know if anybody's been shot. |
| 2:12 | Police: | [inaudible voices in the background] |
| 2:15 | Fire: | Yeah.  Yeah.  You're gonna have to let us know. |
| 2:19 | 911: | Okay.  I'll say Fire advised and needs to be advised. |
| 2:21 | Fire: | Sounds good. |
| 2:22 | 911: | Okay.  Thank you. |
| 2:23 | Fire: | Thank you.  Bye, bye. |
| 2:24 | Arambula: | I can't breathe.  I can't breathe. |
| 2:26 | Police: | Shut the fuck up. |
| 2:26 | Arambula: | Officer, why did you kill me? |
| 2:30 | Police: | Here, I got him.  You guys hold on the bedroom. |
| 2:42 | Police: | We just fucking shot a man. |
| 2:48 | Arambula: | ……, I love you. |
| 2:51 | Police: | Fuck. |
| 2:52 | Arambula: | I love you. |
| 2:58 | Police: | [inaudible voices in the background] |
| 3:04 | Police: | [inaudible voice over the radio] |
| 3:38 | Police: | Alright, back out.  [inaudible] |
| 3:47 | Arambula: | Hey. |
| 3:50 | 911: | Sir, are you there?  Hello? |
| 4:08 | Arambula: | I need help. |
| 4:10 | Police: | Fire's coming buddy.  Fire's coming. |
| 4:20 | 911: | Sir, has anybody injured in your home?  Sir?  Sir? |
| | | (lots of noise and talking in the background) |
| 4:47 | 911: | Sir, this is the police department.  Are you on the line? |

| Time lapsed | Speaker | |
|---|---|---|
| | | Can you advise me if anybody has been injured inside your home?  Hello? |
| | | (talking in background.) |
| 5:25 | 911: (to someone there with her) | Hey Tammy.  I heard my guy yelling "I need help" but I cannot….(inaudible) yelling "I need help."  (inaudible) Okay. |
| | | (talking in background) |
| 5:58 | Police: | (inaudible) we fucked up. (inaudible) |
| 5:59 | Lilly: | I fucking shot this guy.  (inaudible) fucked up. |
| 6:04 | 911: | Sir?  Sir? |
| | | (talking in background.) |
| 6:07 | Lilly: | Someone came out of the fucking room. |
| 6:10 | Coutts: | Was the gun down here? |
| 6:13 | Lilly: | I don't know.  I heard screaming and I (inaudible) fire |
| 6:15 | Coutts: | That's alright.  (talking at same time as Lilly) |
| 6:16 | Coutts: | Don't worry about it.  I got your back. |
| 6:20 | Coutts: | We clear? |
| 6:21 | Operator: | 3126. |
| | | (talking in background) |
| 6:44 | Operator: | ….but he's not responding to me. |
| | | (talking in background) |
| 7:25 | Police on radio: | Ok.  Officers inside of that house we're just getting Fire to (inaudible) |
| 7:50 | Operator: | Hello? |
| | | (inaudible talking in the background) |
| 7:54 | Police on radio: | ….for the time being.  I want all responding officers to just go ahead and…..32nd street and Flower.   All ….. responding officers. |
| 8:13 | Police: | …..the back of the house |
| | | (inaudible talking in the background) |
| 9:07 | Police on radio: | …up here to stand by the shooting officer. |
| | | (inaudible talking in the background) |
| 9:39 | Police: | ….there is to be no one else inside that house. (inaudible) |
| | | (inaudible talking in the background) |
| 10:00 | | …evac the subject to  …. |
| 10:02 | | [alarm sound] |
| 10:10 | | (no more background sounds) |
| 11:10 | | [audio recording ends] |